## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JUSTIN CARTER, *derivatively*
*and on behalf of* MGP INGREDIENTS,
INC.,

        **Plaintiff,**

v.

AUGUSTUS C. GRIFFIN, et al.,

        **Defendants,**

     **and**

MGP INGREDIENTS, INC.,

        **Nominal Defendant.**

Case No. 20-2281-DDC-JPO

---

## MEMORANDUM AND ORDER

This Order stems from defendants' Motion to Dismiss (Doc. 15).  For reasons explained below, the court grants the motion in part and denies it in part.  Specifically, the court grants the Motion to Dismiss plaintiff's federal claims.  The court denies the motion, however, as it applies to plaintiff's state law claims.  Also, the court stays the case pending the Kansas Supreme Court's review of *Herington v. City of Wichita*, 479 P.3d 482 (Kan. Ct. App. 2020).

I.      **Background**

A.    **Procedural History**

Plaintiff Justin Carter initiated this action in June 2020.  *See* Doc. 1 (Compl.).  After securing several extensions of time, *see* Docs. 11, 13, defendants filed the pending Motion to Dismiss (Doc. 15) in April 2021.  Their motion is supported by a Memorandum in Support of Motion to Dismiss (Doc. 16).  Plaintiff filed a responsive brief, titled Plaintiffs' Partial

Opposition to Defendants' Motion to Dismiss the Federal Claims and Stay the State Claims (Doc. 17).  And defendants then filed a Reply Brief in Support of Motion to Dismiss (Doc. 18).  Seeing that the matter is fully briefed, the court now will rule defendants' Motion to Dismiss (Doc. 15).  But first, the court turns to several background subjects that inform the analysis to follow.

### B.   Derivative Shareholder Actions

This action is a derivative shareholder lawsuit.  *See* Doc. 1 at 1 (Compl.).  A derivative lawsuit "is a suit by a shareholder to enforce a corporate cause of action[,]" which, in turn, requires that the "corporation is a necessary party to the suit."  *Price v. Gurney*, 324 U.S. 100, 105 (1945).  That's why MGP appears—in both halves of the caption—at least ostensibly as a plaintiff and nominal defendant.  *See* Doc. 1 at 1 (Compl.).  If any of Mr. Carter's claims survive defendants' Motion to Dismiss, plaintiff is "allowed to act in protection of [MGP's] interest somewhat as a 'next friend' might do for an individual," on the theory that "wrongdoing officers . . . possess the control which enables them to suppress any effort by the corporate entity to remedy such wrongs."  *Koster v. (Am.) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 522–23 (1947).  In other words, plaintiffs in derivative actions "step into the corporation's shoes . . . to seek in its right the restitution he could not demand in his own."  *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 548 (1949).

### C.   The Parties in this Action

The Complaint alleges a few important introductory points about the parties in this suit.  For clarity's sake, the court identifies these individuals before turning to the lawsuit's broader components.  This information comes from plaintiff's Complaint (Doc. 1).  For purposes of this

Order, the court assumes these allegations are true.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

### 1.  Plaintiff

"Plaintiff Justin Carter is a current stockholder of [MGP] and intends to retain ownership of said shares through the prosecution of the instant matter."  Doc. 1 at 2 (Compl. ¶ 4).  Plaintiff is suing a handful of individuals who have or still do serve in leadership roles at MGP.  Below, the court identifies these defendants.

### 2.  "The Director Defendants"

Some defendants named in plaintiff's Complaint serve or used to serve as Directors on MGP's Board.  These individuals are:  (1)  Augustus Griffin, (2) David Colo, (3) Terrence Dunn, (4) James Bareuther, (5) Anthony Foglio, (6) Lynn Jenkins, (7) Karen Seaberg, and (8) M. Jeannine Strandjord.  *See id.* at 3–4 (Compl. ¶¶ 6–13).  The Complaint refers to this group of defendants as "the Director Defendants," *id.* at 4 (Compl. ¶ 14), terminology that this Order adopts.

Defendant Griffin is MGP's former President and CEO.  *See id.* at 3 (Compl. ¶ 6).  Defendant Colo previously served as MGP's President and COO, and now acts as the company's President and CEO.  *See id.* (Compl. ¶ 7).  The remaining defendants—Dunn, Bareuther, Foglio, Jenkins, Seaberg, and Strandjord—all have served on MGP's Board of Directors and in various roles on related Board Committees.  *See id.* at 3–4 (Compl. ¶¶ 8–13).

### 3.  "The Officer Defendants"

The Complaint names two more defendants.  These individuals are described together in the Complaint as the "Officer Defendants[.]"  *See id.* at 5 (Compl.).  These individuals are:  (1) Brandon Gall, and (2) Thomas Pigott.  *Id.* (Compl. ¶¶ 16–17).  Defendant Gall, according to the

Complaint, serves in several roles at MGP:  (i) CFO, (ii) Vice President of Finance, and (iii) Corporate Controller.  *Id.* (Compl. ¶ 16).  Defendant Pigott is MGP's former CFO and Vice President of Finance.  *Id.* (Compl. ¶ 17).

### D.    Plaintiff's Allegations

#### 1.   Plaintiff's Factual Allegations

The court reviews plaintiff's factual allegations against the backdrop of defendants' Motion to Dismiss.  Accordingly, a few guiding principles apply.  The court must "accept as true all particularized allegations of fact and give [plaintiff] all reasonable inferences logically flowing from them."  *City of Cambridge Ret. Sys. v. Ersek*, 921 F.3d 912, 918 (10th Cir. 2019) (citing *City of Birmingham Ret. & Relief Sys. v. Good*, 177 A.3d 47, 55–56 (Del. 2017)).  But, the benefits of this presumption aren't limitless.  "'[C]onclusory allegations are not considered as expressly pleaded facts or factual inferences.'"  *Id.* (quoting *White v. Panic*, 783 A.2d 543, 549 (Del. 2001)).  The court must give plaintiff the benefit of any doubts, but only when doing so is reasonable—*i.e.*, because those inferences "logically flow[ ]" from the particularized facts alleged in his Complaint.  *Id.*

Plaintiff's Complaint asserts several causes of action, some of them rooted in federal law and others based on state law.  But plaintiff asserts all of these claims against MGP Ingredients, "a producer and supplier of premium distilled spirits[.]"  Doc. 1 at 12 (Compl. ¶ 21).  Plaintiff's concerns are intricately and exclusively tied to MGP's liquor production—especially so-called "aged whiskey."  *Id.* at 13 (Compl. ¶ 22).

Plaintiff's concerns came to a head in February 2015, when MGP "announced a new five-year plan" involving "key strategies" designed to capitalize on "the rapidly growing whiskey category" within the overall liquor market.  *Id.* at 12 (Compl. ¶ 22) (internal quotation

marks omitted).  MGP's strategic growth plan had a unique hook compared to the company's typical operations.  "[I]nstead of selling the Company's whiskey as an unaged new distillate, which was then barreled and aged by the Company's customers," MGP announced it would begin aging its own brand of whiskey for direct-to-consumer sales.  *Id.* at 12–13 (Compl. ¶ 22).  This process would take about four years to play out because you can't sell aged whiskey without letting it age.  *See id.* at 13 (Compl. ¶ 23).  So, MGP announced, investors and consumers could expect to buy MGP's own branded whiskey by early 2019.  *See id.*

MGP invested $73 million toward its aged whiskey strategy by mid-2018.  *See id.* (Compl. ¶ 24).  And company leadership predicted substantial growth in MGP's operating income in 2019, when its aged whiskey would be ready for sale.  *See id.* (Compl. ¶¶ 25, 27).  By early 2019, MGP's leadership expressed similar sentiments, telling investors "that the Company 'continue[s] to see strong demand for aged whiskey as customers seek to fill inventory gaps driven by higher-than-expected consumer demand.'"  *Id.* at 16 (Compl. ¶ 34).  Shortly before that point, financial analysts "reported that the Company['s] management was 'adamant that it could sell the entire inventory at the 3x multiple tomorrow if needed[.]'"  *Id.* at 14 (Compl. ¶ 29).

But things didn't go according to that plan.  The Complaint alleges that MGP suffered from unsold inventory and related financial loss for all of 2019.  "On May 1, 2019, the Company issued a press release and reported poor financial results for the first quarter of 2019."  *Id.* at 17 (Compl. ¶ 39).  "On July 31, 2019, . . . the Company issued a press release and reported that the Company's quarterly financial results for the second quarter of 2019 . . . again missed expectations."  *Id.* at 18 (Compl. ¶ 46).  "On October 31, 2019, the Company issued a press release and reported that its financial results for the third quarter of 2019 were again below expectations."  *Id.* at 20 (Compl. ¶ 52).  And "on February 26, 2020, the Company announced its

2019 fourth quarter and fiscal year financial results," which showed "that the Company had experienced disappointing results yet again[.]"  *Id.* at 22 (Compl. ¶ 60) (internal quotation marks and alterations omitted).

Each time MGP's growth strategy stumbled, the company's stock value fell.  The Company's first quarter results preceded a decline in stock price by about 23%.  *See id.* at 17 (Compl. ¶ 40).  After MGP announced its second quarter 2019 results, "the Company's stock price declined by approximately 26%[.]"  *Id.* at 19 (Compl. ¶ 48).  MGP's third quarter performance announcement was followed by a 12% drop in stock price.  *See id.* at 20 (Compl. ¶ 53).  And the company's February 2020 announcement spurred a decline in stock price around 11%.  *See id.* at 22 (Compl. ¶ 61).

Plaintiff's Complaint links these figures to accompanying statements from MGP's leadership which, according to the Complaint, were materially false or misleading.  Plaintiff's biggest concern is this:  Throughout 2019, and despite consistent, disappointing financial results, MGP's leadership reassured investors that its aged whiskey strategy still could succeed.  *See, e.g.*, *id.* at 19–20 (Compl. ¶¶ 50–51) (alleging that on the same day MGP announced its second quarter 2019 financial results, defendant Griffin reassured investors that the company "remain[ed] confident in both the long-term demand for and the value of this inventory" and averring that this statement was "materially false and misleading because the Company had no reasonable basis to claim that it had any meaningful insight into the demand for its aged-whiskey").  These optimistic predictions, according to the Complaint, weren't a one-off sort of thing.  The Complaint alleges that MGP's leadership offered unrealistically optimistic reassurances nearly every time it announced distressing financial results.  *See id.* at 17–21 (Compl. ¶¶ 41–43, 47, 49, 54–55).  Plaintiff alleges these statements were so unrealistic that they

form the basis of an actionable securities fraud case. *See id.* at 31–37 (listing plaintiff's five counts against defendants).

### 2. Plaintiff's Causes of Action

The information above leads the way for plaintiff's specific claims against the defendants. Plaintiff asserts five claims in discrete counts—three of them based in state law and the remaining two rooted in federal law. The court describes these claims, below.

### a. State Law Claims

Most of plaintiff's claims are tied to causes of action rooted in state law.[1] Count I alleges that the Director Defendants breached their fiduciary duties. *See id.* at 31 (Compl. ¶¶ 94–99). Count II asserts a claim against the Director Defendants for waste of corporate assets. *See id.* at 32 (Compl. ¶¶ 100–04). And Count III contends that all of the individual defendants are liable for unjust enrichment. *See id.* at 32–33 (Compl. ¶¶ 105–08).

### b. Federal Law Claims

Plaintiff's other two claims assert causes of action under federal law. He asserts Count IV against the Director Defendants and claims that each of them is liable for violations of federal securities laws. Specifically, Count IV relies on Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 from the United States Securities and Exchange Commission ("SEC"). *See id.* at 33–35 (Compl. ¶¶ 109–16).[2] Count V alleges a claim against defendants Griffin and Colo for so-called control person liability under Section 20(a) of the Securities Exchange Act.[3] *See id.* at 35–36 (Compl. ¶¶ 117–20).

---

[1]      The Complaint never specifies which state's laws it's invoking.

[2]      Section 10(b) of the Securities Exchange Act is codified as 15 U.S.C. § 78j(b). SEC Rule 10b-5 is codified as 17 C.F.R. § 240.10b-5.

[3]      Section 20(a) of the Securities Exchange Act is codified as 15 U.S.C. § 78t(a).

## II.     Legal Standards

### A.     Fed. R. Civ. P. 12(b)(6)

When a defendant makes a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court

must assume that the Complaint's factual allegations are true. *Iqbal*, 556 U.S. at 678 (citing *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  But the court isn't "'bound to accept as true a

legal conclusion couched as a factual allegation.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555).

"'Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice'" to state a claim for relief.  *Bixler v. Foster*, 596 F.3d 751, 756 (10th

Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678).  Also, the Complaint's "[f]actual allegations must be

enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citations

omitted).

The Complaint thus "must contain sufficient factual matter, accepted as true, to 'state a

claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S.

at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability

requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."

*Id.* (quoting *Twombly*, 550 U.S. at 556); *see also Christy Sports, LLC v. Deer Valley Resort Co.*,

555 F.3d 1188, 1192 (10th Cir. 2009) ("The question is whether, if the allegations are true, it is

plausible and not merely possible that the plaintiff is entitled to relief under the relevant law."

(citation omitted)).

### B.      Fed. R. Civ. P. 21.3 and Demand Futility

This isn't a run of the mine motion to dismiss under Rule 12.  This case includes securities fraud claims asserted in a derivative shareholder action.  And so, defendants have moved for dismissal under both Rule 12 and Rule 23.1 of the Federal Rules of Civil Procedure. This latter Rule governs derivative actions.  *See* Fed. R. Civ. P. 23.1.

Rule 23.1 emphasizes "particularity."  A plaintiff shareholder's complaint must "state with particularity" the details of plaintiff's efforts "to obtain the desired action" from the corporation's directors and, if necessary, its shareholders.  Fed. R. Civ. P. 23.1(b)(3)(A).  Also, the Rule requires plaintiff to state with "particularity" his reasons "for not obtaining the action or not making the effort."  Fed. R. Civ. P. 23.1(b)(3)(A)–(B).

Derivative lawsuits are "an extraordinary process" because they permit a shareholder to assume control of legal rights belonging to a corporate entity.  *Quinn v. Anvil Corp.*, 620 F.3d 1005, 1012 (9th Cir. 2010) (internal quotation marks and citation omitted).  Given "the extraordinary nature of a shareholder derivative suit, Rule 23.1 establishes stringent conditions for bringing such a suit."  *Id.* (citation omitted).  Those "stringent conditions" include so-called pre-suit demand and demand excusal.  *Id.*; *see also City of Cambridge*, 921 F.3d at 918.

These concepts apply to derivative actions because "the cause of action belongs to the corporation," not the plaintiff himself.  *City of Cambridge*, 921 F.3d at 918.  So, "shareholders, as a 'precondition for the suit,' must make a pre-suit demand on the corporation's board of directors to pursue the litigation, 'unless excused by extraordinary conditions.'"  *Id.* (quoting *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96 (1991)).  In other words, a plaintiff who wishes to assert such an extraordinary cause of action can't fast track his lawsuit.

Instead, he first must seek the board of directors' approval by issuing a demand.  *See id.*
("Rule 23.1 requires the complaint to state with particularity any effort to obtain the desired
action from the corporation's directors[.]" (internal quotation marks, citation, and alteration
omitted)); *see also Grogan v. O'Neil*, 307 F. Supp. 2d 1181, 1190 (D. Kan. 2004) (explaining
that plaintiffs seeking to "assert a derivative action . . . must comply with the demand
requirement of Rule 23.1").  The purpose of the demand requirement is "to afford the directors
an opportunity to exercise their reasonable business judgment and waive a legal right vested in
the corporation in the belief that its best interests will be promoted by not insisting on such a
right." *Kamen*, 500 U.S. at 96 (internal quotation marks, citation, and alteration omitted).  In
other words, it's up to the board whether to permit a shareholder plaintiff to proceed with the
derivative action.

Typically, a shareholder may bring a derivative action only after he demands that the
board of directors bring the suit.  *Id.*  Directors have this discretion, courts have reasoned, to
"prevent abuse of this remedy[.]" *Id.* at 95–96.  It's why "courts established as a precondition
'for the suit' that the shareholder demonstrate 'that the corporation itself had refused to proceed
after suitable demand, unless excused by extraordinary conditions.'" *Id.* (quoting *Ross v.
Bernhard*, 396 U.S. 531, 534 (1970)).

In the current case, plaintiff didn't make a pre-suit demand.  This omission means he
must allege—with particularity—that extraordinary conditions existed and they made any effort
at demand pointless—*i.e.*, futile.  *Id.* at 96 ("Ordinarily, it is only when demand is excused that
the shareholder enjoys the right to initiate suit on behalf of his corporation in disregard of the
director's wishes." (citation and internal quotation marks omitted)).  That condition commonly is
called demand futility.  Demand futility is a firm requirement when shareholders decline to

present a demand to the board.  *City of Cambridge*, 921 F.3d at 918 (explaining that plaintiff must "plead the reasons such demand would have been futile").

Here, plaintiff didn't issue a demand.  *See, e.g.*, Doc. 1 at 28 (Compl. ¶ 80) ("Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.").  His case therefore can proceed only if demand was futile.  To make this decision, the court examines plaintiff's Complaint in search of particularized factual allegations providing a basis to conclude that demand would've proved futile.  *See City of Cambridge*, 921 F.3d at 918 (explaining that plaintiffs who don't seek demand must demonstrate demand futility in accordance with the particularity requirements described in Rule 23.1).

This stage of the inquiry relies on state law for guidance.  *See Grogan*, 307 F. Supp. 2d at 1190 ("The [c]ourt applies . . . state substantive law to determine whether demand on the board would have been futile." (citation omitted)).  Specifically, the court considers the state law of the corporate entity's state of incorporation.  *City of Cambridge*, 921 F.3d at 918 ("Whether the complaint's particular allegations suffice depends upon the substantive law of the state in which the entity is incorporated[.]").  MGP incorporated in Kansas.  *See* Doc. 1 at 3 (Compl. ¶ 5).  So, Kansas state law governs the question whether the court should excuse demand as futile.  *Kamen*, 500 U.S. at 108–09 (holding that the demand inquiry turns on "the law of the State of incorporation").  This conclusion implicates a second state's laws because "Kansas courts have a long history . . . of looking to the decisions of the Delaware courts involving corporation law, as the Kansas Corporation Code was modeled after the Delaware Code."  *Arnaud v. Stockgrowers State Bank of Ashland, Kan.*, 992 P.2d 216, 218 (Kan. 1999) (citation omitted).

To bring things full circle and summarize:  *First*, plaintiff's cause of action isn't so much his own as it is the corporation's.  *Kamen*, 500 U.S. at 95 ("[T]he purpose of the derivative action was to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of faithless directors and managers." (internal quotation marks and citation omitted)).  *Second*, it's an "extraordinary" way for shareholders to take the reins of the company.  *Quinn*, 620 F.3d at 1012.  *Third*, and because of this precept, plaintiff can't open the courthouse doors without making a particularized showing that he obliged Fed. R. Civ. P. 23.1.  *Cf. City of Cambridge*, 921 F.3d at 918 n.7 ("Rule 23.1's rigorous pleading requirements . . . [are] 'more onerous' than Rule 12(b)(6)." (quoting *McPadden v. Sidhu*, 964 A.2d 1262, 1296 (Del. Ch. 2008))).

Plaintiff can satisfy this prerequisite in one of two ways.  He can initiate a pre-suit demand on the board of directors, which means he must allege those efforts with "particularized" factual allegations.  Fed. R. Civ. P. 23.1.  In this case, plaintiff didn't issue a demand to the board.  He therefore must demonstrate that a demand to the board would've been futile.  And he must do so through particularized allegations.  *See* Fed. R. Civ. P. 23.1.

What counts as enough particularity in this type of dispute?  The "function of the demand doctrine in delimiting the respective powers of the individual shareholder and of the directors to control corporate litigation clearly is a matter of 'substance,' not 'procedure.'"  *Kamen*, 500 U.S. at 96–97 (citing *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 543–44 (1984) (Stevens, J., concurring in judgment)).  And, "federal procedural rules cannot establish substantive law."  *In re ZAGG Inc. S'holder Derivative Action*, 826 F.3d 1222, 1227 (10th Cir. 2016).  So, the court must identify the governing substantive law and apply it to resolve this dispute.

Consistent with "the rigorous pleading standard" established by Rule 23.1, the court's review of plaintiff's Complaint isn't nearly as generous as the review under Fed. R. Civ. P. 12(b)(6). *City of Cambridge*, 921 F.3d at 925. Instead, the court views plaintiff's Complaint through a lens that "requires substantially more than notice pleading and the 'liberal pleading requirements' do not apply." *Grogan*, 307 F. Supp. 2d at 1190 (quoting *Kaufman v. Kan. Gas & Elec. Co.*, 634 F. Supp. 1573, 1578 (D. Kan. 1986)). Of course, plaintiff must make particularized allegations in the first place. *City of Cambridge*, 921 F.3d at 918 ("In evaluating the Shareholders' pleading, we accept as true all *particularized allegations* of fact and give the Shareholders all reasonable inferences logically flowing from them." (emphasis added and citation omitted)).

In sum, and at this stage of the action, the court must "decide only whether such demand would have been futile." *Id.* at 917.

## III. Analysis

This lawsuit is unusual in more ways than one. As already noted, derivative actions are a unique species of litigation. But this specific lawsuit is noteworthy for the independent reason that the parties' briefing is quite narrow. In total, their substantive arguments consume just six pages of prose. *See* Docs. 16, 17, 18.

That's because defendants here argue that the court should grant their Motion to Dismiss for the same reasons it followed in an earlier, similar case. *See Dorfman v. Griffin*, No. 20-2239-DDC-JPO, 2021 WL 1209734 (D. Kan. Mar. 31, 2021). Specifically, defendants ask the court to dismiss plaintiff's federal claims and stay the case on plaintiff's state law claims until the Kansas Supreme Court concludes its review of *Herington v. City of Wichita*, 479 P.3d 482 (Kan. Ct. App. 2020). *See* Doc. 16 at 2.

Meanwhile, plaintiff proposes a slightly different path forward. He asks the court to either (1) deny defendants' motion altogether, or (2) "stay the instant derivative action in its entirety" until the *Herington* decision is announced. Doc. 17 at 2. Plaintiff also requests 30 days to amend his Complaint if the court determines that any of his claims are deficient and therefore subject to dismissal. *See id.*

The court agrees with defendants. This case involves nearly identical dynamics as those in *Dorfman*.[4] The court finds no reason to change course from the outcome there—and plaintiff hasn't suggested any reason. The governing laws, precedent, and pleading requirements are no different now than they were in March 2021. And, as the court explains below, plaintiff's Complaint is deficient under the heightened pleading standard that Fed. R. Civ. P. 23.1 requires. The appropriate outcome is as follows: (1) the court grants defendants' Motion to Dismiss (Doc. 15) against plaintiff's federal claims, and (2) the court stays this case on plaintiff's state law claims until the Kansas Supreme Court issues its decision on review of *Herington v. City of Wichita*, 479 P.3d 482 (Kan. Ct. App. 2020).

### A.   The Court Grants Defendants' Motion to Dismiss Plaintiff's Federal Claims.

The court starts with plaintiff's federal claims because those issues fall squarely within the court's original federal question jurisdiction. *See* 28 U.S.C. § 1331. Plaintiff's federal claims are deficient under the heightened pleading standard demanded under Fed. R. Civ. P. 23.1. Likewise, some of them are foreclosed by controlling precedent. The court explains all of this in greater detail, below.

---

[4]   Every claim presented in plaintiff's Complaint here also was alleged by Mr. Dorfman's Amended Complaint. The only distinguishing aspect between these two cases is the fact that Mr. Dorfman's Amended Complaint named one defendant not mentioned in this Complaint, and alleged one claim that isn't included in this Complaint. In other words, every allegation in plaintiff's Complaint here names the same defendants and asserts the same causes of action that *Dorfman* alleged.

1. **The Complaint's Allegations About Violations of Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5 are Deficient Under Rule 23.1.**

Count I of the Complaint—aimed at the Director Defendants—alleges that these individuals "disseminated or approved public statements that failed to disclose" key information about MGP's ability to perform in its aged whiskey strategy. Doc. 1 at 33 (Compl. ¶ 110). Their misstatements or omissions, plaintiff alleges, violate Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5. *See id.* at 33–35 (Compl. ¶¶ 109–16). Specifically, plaintiff alleges that the Director Defendants disguised or omitted from public statements:

> that (i) the Company and its management did not have meaningful visibility into consumer demand for aged whiskey or relevant market trends; (ii) the Company struggled to find customers interested in the Company's aged whiskey inventory, and had yet to make any significant sales of its aged whiskey at the prices that the Individual Defendants represented to investors; (iii) as a result of the foregoing, the Company would build up a surplus of unsold aged whiskey, which would lower the value of the Company's inventory and further impair the Company's ability to achieve sales on favorable terms; and (iv) the Company failed to maintain internal controls.

*Id.* at 33 (Compl. ¶ 110). And based on these specific allegations, "the Company's shares [were] artificially inflated due to the deception" of the Director Defendants. *Id.*

But the court, at this juncture, needn't answer the question whether the Director Defendants actually did the things plaintiff alleges. Instead, the more immediate question before the court is whether these defendants aren't capable of exercising independent judgment over a demand to bring suit. To be sure, plaintiff's Complaint makes this allegation against the Director Defendants. *See id.* at 28 (Compl. ¶ 82) ("The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action."). Here's what Rule 23.1 and controlling precedent demand from these allegations in terms of their specificity.

## 2. The Appropriate Test for Determining Demand Futility

The demand futility inquiry is a two-step process, with most of the action at the second step.

*First*, courts turn to Fed. R. Civ. P. 23.1. It mandates that plaintiffs in a derivative suit allege *with particularity* their efforts to secure demand from the board, or their reasons for not doing so. Fed. R. Civ. P. 23.1(b)(3)(A)–(B). But, "federal procedural rules cannot establish substantive law." *In re ZAGG, Inc.*, 826 F.3d at 1227. "Rule 23.1 clearly *contemplates* both the demand requirement and the possibility that demand may be excused, [but] it does not *create* a demand requirement of any particular dimension." *Kamen*, 500 U.S. at 96. So, *second*, "federal common law should adopt the futility law of the state of incorporation of the company on behalf of which the plaintiffs are bringing suit." *In re ZAGG, Inc.*, 826 F.3d at 1228. Rule 23.1 provides a blueprint, but leaves it to state law to provide the structure.

Here, Kansas law supplies the law controlling for the futility analysis. Specifically, Kan. Stat. Ann. § 60-223a(b)(3) provides the rules for derivative actions and demand. But, those rules mimic what Rule 23.1 provides. Kan. Stat. Ann. § 60-223a(b)(3); *see also Kaufman*, 634 F. Supp. at 1576 (explaining that Kan. Stat. Ann. § 60-223a "is virtually identical to Rule 23.1"). Where can the court find a test for determining demand futility? All roads lead to Delaware, it seems. *See Arnaud*, 992 P.2d at 218 (collecting cases from Kansas elaborating on the closely mirrored relationship between corporations laws in Kansas and Delaware); *see also Kan. Heart Hosp., L.L.C. v. Idbeis*, 184 P.3d 866, 878 (Kan. 2008) ("Reliance on a Delaware decision is consistent with our long history of looking to Delaware for guidance when applying the Kansas General Corporation Code, which was modeled on the Delaware Code." (citations omitted)).

This court thus "follows two landmark decisions of the Supreme Court of Delaware on demand futility:  *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984), and *Rales v. Blasband*, 634 A.2d 927 (Del. 1993)."  *In re ZAGG, Inc.*, 826 F.3d at 1229.  The *Aronson*[5] and *Rales* tests each come with a bit of nuance, but those distinctions don't matter here.  As the Tenth Circuit explained in *City of Cambridge*, "the distinction between *Aronson* and *Rales* is immaterial in this case" because the plaintiff/shareholder asserts that the directors face liability from suit and are therefore incapable of impartially acting on demand.  921 F.3d at 919 n.9 (citations omitted).

This is so because either test would excuse demand if the directors are to face a substantial likelihood of liability.  *Compare Aronson*, 473 A.2d at 815 (finding that if director conduct was "so egregious" that it failed the business judgment test, it also would expose the directors to liability and therefore provide a basis for demand excusal), *with Rales*, 634 A.2d at 936 (finding directors' failure to act created a risk of personal liability, which, in turn, evidenced the directors' inability to exercise independent business judgment).

That's exactly what plaintiff's Complaint alleges:  "The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment[.]"  Doc. 1 at 28 (Compl. ¶ 82).  The Complaint alleges the following defendants face a substantial likelihood of personal liability relating to these allegations:  (1) Colo, (2) Bareuther, (3) Dunn, (4) Foglio, (5) Jenkins, (6) Seaberg, and (7) Strandjord.  *See id.* at 29–30 (Compl. ¶¶ 89, 92).  Thus, the Complaint asserts that seven of the eight Director Defendants—*i.e.*, a majority—face a substantial likelihood of liability, meaning the court should excuse demand.

The court thus considers whether plaintiff's Complaint voices these allegations with the requisite particularity contemplated by Rule 23.1 and Kansas state law, and in light of the Tenth

---

[5]    *Aronson* was overruled on other grounds by *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

Circuit's synthesis of the *Aronson* and *Rales* tests. *City of Cambridge*, 921 F.3d at 919 n.9; *see also United Food & Commercial Workers Union v. Zuckerberg*, 250 A.3d 862, 889–90 (Del. Ch. Oct. 26, 2020) (reflecting an emerging trend in Delaware cases rejecting the *Aronson*/*Rales* distinction, calling the *Aronson* test "broken," and advocating a "hybrid of *Aronson* and *Rales*" similar to the framework established by the Tenth Circuit in *City of Cambridge*).

### 3. Plaintiff Hasn't Alleged Sufficiently that a Majority of the Board Faces a Substantial Likelihood of Personal Liability.

Plaintiff's Complaint alleges the following:  "Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act."  Doc. 1 at 28 (Compl. ¶ 80).  The court disagrees with plaintiff's conclusion. *Cf. La. Mun. Police Emps.' Ret. Sys. v. Hesse*, 962 F. Supp. 2d 576, 587–91 (S.D.N.Y. 2013) (granting motion to dismiss because plaintiff was "unable to identify particularized facts of Defendants' knowledge or conduct, actual or constructive, evidencing a breach of fiduciary duties").

Plaintiff alleges that MGP shareholders were the losers when MGP gambled on its aged whiskey strategy.  But, that doesn't necessarily mean their gamble was fraudulent and, therefore, an illegal "scheme."  Doc. 1 at 34 (Compl. ¶ 111).  Plaintiff must allege particularized facts because "the court is not obligated to accept as true bald assertions, unsupported conclusions and unwarranted inferences" when evaluating defendants' Motion to Dismiss under Rule 23.1. *DiBattista v. Greco*, No. 20-590-RGA, 2021 WL 327399, at *5 (D. Del. Jan. 31, 2021) (explaining United States Magistrate Judge's Report and Recommendation that the district court dismiss plaintiff's action for failing to plead demand futility and lack of subject matter jurisdiction (citing *In re Caterpillar Inc. Derivative Litig.*, No. 12-1076-LPS-CJB, 2014 WL 2587479, at *7 (D. Del. June 10, 2014))).

To the contrary, the court also could infer from these events that defendants, despite their good faith efforts, failed to recognize a strategic failure looming on the horizon. *See Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 373 (Del. 2006) (affirming Delaware Chancery Court's dismissal of plaintiff's derivative action and explaining plaintiff's argument failed to "recognize that the directors' good faith exercise of oversight responsibility may not invariably prevent employees from . . . causing the corporation to incur significant financial liability"). The hurdle is remarkably high in this case. Plaintiff must allege—with particularity—that a majority of the directors who would have considered a demand from plaintiff couldn't do so independently because they acted with conscious disloyalty to MGP and its shareholders. *See City of Cambridge*, 921 F.3d at 921 (affirming district court's dismissal for failure to plead demand futility and explaining that demand futility is typically assessed in comparison to the directors who would've been faced with demand, had plaintiff presented it).

The Complaint's allegations describe a few areas where, plaintiff says, it's easily possible to infer fraudulent intent. But each of these allegations is foreclosed by at least one of two factors. Either the Complaint itself is devoid of requisite particularities or controlling case law renders plaintiff's allegations as deficient ones, in light of Rule 23.1's particularity requirement. The court examines these issues, below.

### a.   Press Releases, Public Statements, and Financial Filings

The Complaint alleges that MGP's leadership made materially false or misleading statements to the investing public through several forms of communications—including press releases, public statements during investor calls, and filings with the SEC. But none of these allegations demonstrate with particularity that the Director Defendants acted with a fraudulent

intent.  Below, the court surveys a few examples of the Complaint's allegations.  Then, the court explains why these allegations fall short of their aim.

For instance, in November 2018, Defendant Griffin told listeners on the company's 2018 third quarter earnings call that "'we're feeling increasingly confident in both the demand for that inventory and the pricing for that inventory' and that the Company has not 'seen anything that would change our view of the value of that inventory.'"  Doc. 1 at 14 (Compl. ¶ 28).  During a February 2019 earnings call, defendant Griffin allegedly stated:  "[W]e feel very confident that we have visibility to the aged sales we need to deliver the guidance this year[.]"  *Id.* at 16 (Compl. ¶ 37).  The same day, MGP issued a press release stating, in part, that MGP was "confident that [its] strategy and investments have [it] well positioned, and will provide [it] the resources" needed "to deliver strong growth in 2019 and beyond."  *Id.* at 14 (Compl. ¶ 30) (internal quotation marks omitted).  As for MGP's financial filings with the SEC, the Complaint identifies the company's 2018 SEC Form 10-K.  That document stated:  "There is an inherent risk in determining the quantity of maturing stock of aged distillate to lay down in a given year for future sales as a result of changes in consumer demand, pricing, new brand launches, changes in product cycles, and other factors."  *Id.* at 15 (Compl. ¶ 32).  The Form 10-K also stated:  "It may be more difficult to make accurate predictions regarding new products and brands."  *Id.* (emphasis omitted).

According to the Complaint, all these statements "were materially false and misleading because they failed to disclose material facts necessary to make the statements made not false and misleading."  *Id.* at 16 (Compl. ¶ 38).  Specifically, these statements allegedly failed to make clear that MGP "was not experiencing strong demand for its aged whiskey and had no reasonable basis to represent to investors that it had a good line of sight into the demand for aged whiskey."

*Id.* (internal quotation marks omitted).  "As a result, the Company's public statements were materially false and misleading at all relevant times."  *Id.* at 17 (Compl. ¶ 38).  These allegations fall far short of what Rule 23.1 requires from pleadings in a derivative shareholder action.

*First*, each of these excerpts contains optimistic-if-not-cautionary language.  For example, defendant Griffin's statement that MGP was "feeling increasingly confident" about consumer demand for its aged whiskey does not qualify as a definite assertion about consumer demand.  *Id.* at 14 (Compl. ¶ 28).  To the contrary, his words sound like a confident prediction—but they are not a promise to investors.  Likewise, the 2018 SEC Form 10-K expressly provides for the possibility that MGP's strategy could fail.  *See id.* at 15 (Compl. ¶ 32) ("Inaccurate decisions and/or estimations could lead to an inability to supply future demand or lead to a future surplus of inventory and consequent write-down in the value of maturing stocks of aged distillate."); *see also id.* ("As a result, our business, financial condition, or results of operations could be materially adversely affected.").

*Second*, and specific to MGP's filings with the SEC, alleging merely "that the Defendants 'caused' the filing of the allegedly misleading financial statements with the SEC is not, without more, a particularized allegation of fact."  *In re China Auto. Sys. Inc. Derivative Litig.*, No. CV 7145-VCN, 2013 WL 4672059, at *8 (Del. Ch. Aug. 30, 2013) (granting defendants' motion to dismiss (citing *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 133 n.88 (Del. Ch. 2009))).  That's because the board's "execution of . . . financial reports, without more, is insufficient to create an inference that the directors had actual or constructive notice of any illegality."  *Wood v. Baum*, 953 A.2d 136, 142 (Del. 2008) (Delaware Supreme Court decision affirming Chancery's Court's dismissal of plaintiff's derivative action for failure to plead demand futility).  The Complaint must plead "specific factual allegations that reasonably suggest

sufficient board involvement in the preparation of the disclosures that would allow [the court] to reasonably conclude that the director defendants face a substantial likelihood of personal liability." *Citigroup*, 964 A.2d at 134 (dismissing all but one claim (citing *Wood*, 953 A.2d at 142)). Here, the Complaint fails to connect the dots. Instead, plaintiff's allegation mirrors ones rejected in *China Auto Sys., Inc.*, 2013 WL 4672059, at *8, *Citigroup*, 964 A.2d at 134, and *Wood*, 953 A.2d at 142. This theory doesn't advance plaintiff's case against the defendant directors.

Plaintiff's point is conclusory. That is, knowing *now* that the plan fell short, he argues defendants must have known *then* it would have that outcome. The Delaware Supreme Court rejected a similar argument in *Stone*. 911 A.2d at 373 ("With the benefit of hindsight, the plaintiffs' complaint seeks to equate a bad outcome with bad faith."). Without particularized allegations to push the claims past the point of conclusory ones and into a realm of reasonable inference, the *Stone* court agreed that "the Court of Chancery properly . . . dismissed the plaintiffs' derivative complaint for failure to excuse demand by alleging particularized facts that created reason to doubt whether the directors had acted in good faith in exercising their oversight responsibilities." *Id.*

Plaintiff alleges that the Director Defendants had a hand in preparing MGP's financial filings because they all signed the 2018 SEC Form 10-K. *See* Doc. 1 at 14–15 (Compl. ¶ 31). But he doesn't allege—let alone with particularity—what exactly any of the Director Defendants did with respect to that form, other than signing their names. How could the court logically infer that the filing reflects bad faith by specific directors if it can't determine, at the outset, the role those directors played preparing the statement? *See City of Cambridge*, 921 F.3d at 918 ("In evaluating the Shareholders' pleading, we accept as true all particularized allegations of fact and

give the Shareholders all reasonable inferences logically flowing from them." (citation omitted)).

It's plaintiff's burden to connect those dots.  He didn't.[6]

Before the court could agree with plaintiff, it would have to infer the directors possessed

knowledge of the future based on present understandings of specific market factors.  But plaintiff

doesn't allege with any particularity how that inference is possible.  On top of that, and even

assuming the directors *did* know as much, plaintiff must allege with particularity that they

disregarded such knowledge in bad faith as part of a disloyal effort to get rich while the company

faltered.  Again, plaintiff doesn't supply any particularized fact capable of supporting that

inference.  Plaintiff hasn't adduced particularized allegations advancing this inference, so the

court can't accept it.

### b.  Stock Repurchases

Throughout the relevant time period, MGP allegedly "overpaid for repurchases of its own

stock by over $3.5 million."  Doc. 1 at 25 (Compl. ¶ 76).  And plaintiff's Complaint alleges

that—but for the Director Defendants' fraudulent misrepresentations to the investing public—

MGP "would not have purchased its securities at artificially inflated prices[.]"  *Id.* (Compl. ¶

147).

This allegation would flunk even the more generous pleading standard supplied by Fed.

R. Civ. P. 12(b)(6).  It's wholly conclusory.  *See Bixler*, 596 F.3d at 756 ("Threadbare recitals of

the elements of a cause of action, supported by mere conclusory statements, do not suffice."

(internal quotation marks and citation omitted)).  Plaintiff hasn't alleged any factual

particularities to demonstrate what any Director Defendant had in mind during the period at

---

[6]    *See Brehm*, 746 A.2d at 267 (affirming dismissal of derivative action and explaining "there is a
very large—though not insurmountable—burden on stockholders who believe they should pursue the
remedy of a derivative suit instead of selling their stock or seeking to reform or oust these directors from
office").

issue.  Of the statements made by some of them during the relevant period—quoted in the

Complaint to support its allegation about stock repurchases—these individuals spoke only with

optimism about the aged whiskey strategy.  *See, e.g.*, *id.* at 18 (Compl. ¶ 47) (quoting defendant

Griffin as stating, in a July 2019 press release, that MGP "remain[ed] confident in both the long-

term demand for, and the value of this inventory, and expect[ed] to see a significant increase in

sales of aged whiskey over the remainder of the year" (emphasis omitted)).  The court can't infer

from these threadbare assertions that the Director Defendants either knew the strategy would fail

or recklessly disregarded such a possibility when they issued these statements.[7]

### c.  The Directors' Compensation

Plaintiff asserts that making a demand on the board was futile because "each of the

Director Defendants received payments, benefits, stock options, and other emoluments by virtue

of their membership on the Board and their control of the Company."  *Id.* at 29 (Compl. ¶ 85).

The Complaint offers little more about this theory.  *See id.* (Compl. ¶¶ 86–87) (alleging generally

that defendants Griffin and Colo receive compensation from MGP and therefore aren't

disinterested parties).

These allegations are deficient for at least two independent reasons.  *First*, they're

entirely devoid of particularity.  *See* Fed. R. Civ. P. 23.1.  For this reason alone, the court rejects

---

[7]      More than once, the Complaint alleges that MGP would not have repurchased stock had it "known of the material adverse information not disclosed by" the individual defendants.  Doc. 1 at 27 (Compl. ¶ 152).  But the Complaint doesn't allege anything particularized about *what* those details were or how the individual defendants knew them.  Plaintiff seems to want the court to infer from MGP's poor performance that, all the while, defendants withheld information which—if known—would've averted any such shortcomings.  But that logic asks the court to perform logical and legal legwork for plaintiff beyond the court's authority under the governing legal standard.  Plaintiff hasn't supplied particularized allegations demonstrating the conclusion asserted.  Hence, the allegations are conclusory.  And they thus fail under Rules 12(b)(6) and 23.1.

the notion that, because some Director Defendants are or once were paid for their positions, they can't be trusted to exercise independent business judgment if presented with a demand.

*Second*, case law provides that this line of allegations—especially when lacking particularized support—fail at the outset. "[D]irectors have the power, authority and wide discretion to make decisions on executive compensation." *Brehm v. Eisner*, 746 A.2d 244, 262 n.56 (Del. 2000). "The essence of Plaintiff's argument is that the directors are not independent because they receive compensation as directors and wish to continue to do so." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Lundgren*, 579 F. Supp. 2d 520, 535–36 (S.D.N.Y. 2008). However, this argument "for excusing demand has been repeatedly rejected under Delaware law."[8] *Id.* at 536 (citing *Grobow v. Perot*, 539 A.2d 180, 188 (Del. 1988), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)). "This Court's view of the disqualifying effect of such fees might be different if the fees were shown to exceed materially what is commonly understood and accepted to be a usual and customary director's fee." *Orman v. Cullman*, 794 A.2d 5, 29 n.62 (Del. Ch. 2002) (declining to infer disabling interest in board director because that director would have a financial interest through his compensation from the surviving corporation of a corporate merger).

But plaintiff's Complaint doesn't even reference the amount of compensation paid to Director Defendants. So, the court can't begin to assess whether "the fees were shown to exceed materially what is commonly understood and accepted to be a usual and customary director's fee." *Id.* It also doesn't "identify any reason why, in the particular circumstances of this case, the [c]ourt should conclude that the compensation package unduly influenced . . . the director's

---

[8]     The court recognizes that Kansas's laws, not Delaware's, govern this case. But, "Kansas courts have a long history . . . of looking to the decisions of the Delaware courts involving corporation law, as the Kansas Corporation Code was modeled after the Delaware Code." *Arnaud*, 992 P.2d at 218.

decisionmaking." *Ryan v. Gursahaney*, No. C.A. 9992-VCP, 2015 WL 1915911, at *8 (Del. Ch. Apr. 28, 2015).  Looking back to Delaware for guidance, the "law [there] is clear that absent particularized factual allegations indicating such a disabling conflict, 'ordinary director compensation alone is not enough to show demand futility.'"  *Id.* (quoting *A.R. DeMarco Enters., Inc. v. Ocean Spray Cranberries, Inc.*, No. Civ.A. 19133-NC, 2002 WL 31820970, at *5 (Del. Ch. Dec. 4, 2002)).

Plaintiff asks the court to infer from their compensation that some Director Defendants either were biased by or nefariously motivated by their compensation to perpetuate an illegal and fraudulent scheme.  Here, his suggestion is predicated upon another suggestion:  that these directors participated in the scheme to ensure their continued compensation.  Case law is clear that plaintiff's logic could suffice only if he had provided particularized factual allegations demonstrating a basis for a reasonable factfinder to infer a link between compensation and disloyal motives.  He hasn't.  So, this argument can't carry the day.

### d.  The Directors' Committee Memberships

Another line of allegations in the Complaint turns on the Director Defendants' committee memberships—especially MGP's Audit Committee.  Plaintiff alleges:  "Defendants Colo, Bareuther, Dunn, Foglio, Jenkins, and Stranjord breached their fiduciary duties" by "allow[ing] or permit[ing] false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place[.]"  Doc. 1 at 30 (Compl. ¶ 92).  Based on this allegation, the Complaint also alleges that these defendants "face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile."  *Id.* (Compl. ¶ 92).  These allegations suffer the same two fatal flaws noted in subpart c.

*First*, the Complaint lacks any particularized factual allegations that could demonstrate how and why—through their positions on MGP's Audit Committee—these Director Defendants knew and suppressed information showing that MGP couldn't actually perform its aged whiskey strategy.  *See* Fed. R. Civ. P. 23.1.  Instead, plaintiff alleges that these defendants, as members of the Audit Committee, had responsibilities for "reviewing the Company's financial statements, press releases, and assuring the adequacy and effectiveness of disclosure controls, ensur[ing] ethical compliance, and otherwise meet[ing] their responsibilities as set forth in the Audit Committee Charter."  Doc. 1 at 30 (Compl. ¶ 91).  Assuming that allegation is true—as the court must—an allegation that merely lists these Director Defendants' responsibilities isn't capable of supporting a finding or inference that the Director Defendants knew and suppressed information about MGP's inability to succeed on the aged whisky strategy.  Nevertheless, plaintiff leaps from this allegation to the conclusory assertion that these defendants breached fiduciary duties, therefore rendering them biased and incapable of exercising independent business judgment.  But the Complaint barely describes generally—and never with the requisite particularity—how a reasonable factfinder could infer from their committee membership the existence of a fraudulent intent to conceal material information.  In sum, these allegations fail under Rule 23.1's particularity requirement.

*Second*, courts routinely have rejected allegations about fraudulent intent based on a director defendant's membership on a corporate committee.  Our Circuit has explained that the "Delaware cases do not infer knowledge of detail (factual or legal) merely from committee membership or execution of SEC filings, but require specific allegations from which one can infer knowledge."  *In re ZAGG, Inc.*, 826 F.3d at 1234; *see also id.* at 1237 (affirming dismissal because plaintiffs "failed to adequately plead that presuit demand on the Board would have been

futile").  And, the Delaware Supreme Court has "held that to infer knowledge from membership on an audit committee would run 'contrary to well-settled Delaware law.'"  *Id.* (quoting *Wood*, 953 A.2d at 142).  "In short, '[a]s numerous Delaware decisions make clear, an allegation that the underlying cause of a corporate trauma falls within the delegated authority of a board committee does not support an inference that the directors of that committee knew of and consciously disregarded the problem.'"  *Id.* (quoting *South v. Baker*, 62 A.3d 1, 17 (Del. Ch. 2012)).  These findings are instructive because Kansas courts consider Delaware cases when examining conflicts involving Kansas corporations.  *See Kan. Heart Hosp.*, 184 P.3d at 878 ("Reliance on a Delaware decision is consistent with our long history of looking to Delaware for guidance when applying the Kansas General Corporation Code, which was modeled on the Delaware Code." (citations omitted)).

A derivative action plaintiff must show his work.  This plaintiff hasn't.  The Complaint alleges serious claims about corporate malfeasance, but it lacks any particularized allegations to support the premise presented.  And the Complaint's conclusory words can't fill the void.  The court thus rejects the notion that the Complaint alleges with particularity that board committee membership demonstrates demand futility.  *See City of Cambridge*, 921 F.3d at 925 (describing "Rule 23.1's rigorous pleading standard"); *see also id.* (explaining that Rule 23.1 "isn't satisfied absent particularized allegations as to *what* each Director knew and *how* they acted on that knowledge").

### e.  Director Stock Purchases

The Complaint also tries to advance the notion that at least one Director Defendant is disqualified in her independent business judgment based on stock purchases during the relevant period.  "During the Relevant Period, Defendant Seaburg, sold more than 50,452 MGP shares for

28

over $3.48 million in gross insider trading proceeds." Doc. 1 at 33 (Compl. ¶ 107). Plaintiff couches this allegation within his state law claim for unjust enrichment. *See id.* at 32–33 (Compl. ¶¶ 105–08). But the court considers this allegation now in case plaintiff wishes to argue that this fact—on its own—supports his rationale for demand futility. The court concludes that this view is misguided, for reasons explained below.

Plaintiff doesn't allege what percentage of defendant Seaberg's MGP stock ownership is reflected in these sales. And this missing detail matters. In *Smallen v. The Western Union Company*, our Circuit affirmed dismissal of a derivative suit and found defendants' stock sales weren't inherently suspicious when they "constituted only a fraction of their respective holdings." 950 F.3d 1297, 1310–11 (10th Cir. 2020). Most of all, plaintiff doesn't allege particular facts giving rise to a reasonable inference that nefarious reasons motivated these stock sales. "Although insider sales are (rightly) policed by powerful forces . . . it is unwise to formulate a common law rule that makes a director 'interested' whenever a derivative plaintiff cursorily alleges that [she] made sales of company stock in the market at a time when [she] possessed material, non-public information." *Guttman v. Huang*, 823 A.2d 492, 502 (Del. Ch. 2003) (granting dismissal). The court faces a similar allegation here. To depart from *Guttman* "would create the same hair-trigger demand excusal that *Aronson* and *Rales* eschewed." *Id*

The court could draw an inference favoring plaintiff's point of view but only if his Complaint offered particularized allegations about defendant Seaberg's stock sales "that create a sufficient likelihood of personal liability because [she has] engaged in material trading activity at a time when (one can infer from particularized pled facts that) [she] knew material, non-public information about the company's financial condition." *Id.* Plaintiff's allegations about defendant Seaberg aren't particularized when it comes to her alleged knowledge of material,

non-public information.  Instead, the Complaint's rationale requires the court to infer from her status as a director that she knew and withheld material information unknown to the public, and this knowledge influenced her decision to sell MGP stock.  This argument mirrors the ones rejected by the Delaware Chancery Court.  *See id.*; *see also In re Dow Chem. Co. Derivative Litig.*, No. CV 4349-CC, 2010 WL 66769, at *7 (Del. Ch. Jan. 11, 2010) (granting motion to dismiss and rejecting plaintiff's insider trading claim because the "complaint fails to identify any specific knowledge of inside material information on the two relevant trade dates").  The court rejects this rationale because the allegation isn't particularized, which Rule 23.1 requires.  The allegation also fails because persuasive case law instructs that stock sales—standing alone—don't give rise to the reasonable inference that the individual involved acted with fraudulent intent.

### f.   Director Seaberg's "Control Over" Directors Jenkins and Strandjord

The last of the Complaint's demand futility allegations contends that demand is futile because "Directors Jenkins and Stranjord are beholden to and controlled by Defendant Seaberg, whose 68% ownership of the Company's preferred stock provides her with effective control over the continued employment of the Company's Class B Directors."  Doc. 1 at 30 (Compl. ¶ 93). "Thus," the Complaint alleges, Directors Jenkins and Strandjord can't exercise independent judgment if presented with demand.  *Id.*  But the Complaint's allegations on this point aren't particularized, so the court can't accept them.

This allegation requires plaintiff to satisfy a two-step showing.  The first step requires him to satisfy via particularized factual allegations that defendant Seaberg had a disabling conflict of interest.  But, "even directors with 'substantial personal wealth invested in their related companies'" aren't conflicted on that basis alone.  *Dow*, 2010 WL 66769, at *8 (quoting

*In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 821–22 (Del. Ch. 2005)).  Also,

voting power on a board—without more—isn't enough to support an inference of bad faith

motive.  *See Beam v. Stewart*, 845 A.2d 1040, 1051 (Del. 2004) (rejecting a similar bias

argument despite the alleged control person holding 94% of the corporation's voting power and

having social relationships with the other directors preceding their time spent on the company's

Board).  *Beam*'s holding sets a high bar for plaintiff, and his Complaint's allegations don't

provide enough factual particularities for the court even to begin the analysis.

       Plaintiff alleges that defendant Seaberg *is* conflicted because she sold company stock

during the relevant period, which amounted to "insider trading proceeds."  Doc. 1 at 33 (Compl.

¶ 107) (emphasis omitted).  But the previous section of this Order already has explained why

plaintiff hits a dead end with this allegation.  *See Smallen*, 950 F.3d at 1310–11 (discussed *supra*

at page 29).  This allegation doesn't make it past even the first step of the governing analysis.

       But even if the court assumed that plaintiff's Complaint alleged enough about Director

Seaberg's stock sales to clear this first hurdle, it still would conclude that the Complaint fails to

allege a disabling conflict of interest for Directors Jenkins and Strandjord.  That's because the

Complaint's allegations aren't particularized, as the Federal Rules require.  *See* Fed. R. Civ. P.

23.1(b)(3).  Plaintiff's Complaint describes no particularized facts that either of these defendants

acted with a conscious bad faith motivation to disregard materially false or deceptive actions by

the company *because* they'd otherwise lose their board seats.  "The *Aronson* court noted that a

director's nomination or election at the behest of a controlling shareholder is not enough to show

a lack of independence because that 'is the usual way a person becomes a corporate director.'"

*Kanter v. Barella*, 489 F.3d 170, 179 (3d Cir. 2007) (affirming dismissal (quoting *Aronson*, 473

A.2d at 816)).  Here too, plaintiff hasn't adduced allegations of this kind.  The court thus holds

that these allegations aren't sufficient under Rule 23.1's "onerous" pleading requirement. *City of Cambridge*, 921 F.3d at 918 n.7 ("Rule 23.1's rigorous pleading requirements . . . [are] more onerous than Rule 12(b)(6)." (internal quotation marks and citation omitted)).

> **4.   The Complaint's Control Person Liability Claim Fails Because the Complaint Fails to Allege Adequately a Primary Violation of the Securities Laws.**

There's one more set of allegations for the court to consider. "During their tenure as executive officer[s], Defendants Griffin and Colo were a controlling person of all officers of the Company within the meaning of Section 20(a) of the Exchange Act." Doc. 1 at 35–36 (Compl. ¶¶ 119). In other words, and "[b]y reason of their control," these defendants "had the power and authority to direct the management and activities of other Company officers, to hire and fire" them, "and to cause the other Company officers to engage in the wrongful conduct" alleged in the Complaint. *Id.* at 36 (Compl. ¶ 119). This claim is distinct from plaintiff's other federal question allegations because it doesn't turn on the question of demand futility. Instead, Count V of the Complaint—asserting a claim for control person liability under Section 20(a) of the Securities Exchange Act—turns on other sources of law. Below, the court explains the legal standard governing this kind of claim. Then, the court explains why this allegation also is deficient.

Section 20(a) of the Securities Exchange Act creates so-called "control person liability," meaning that "a person who controls a party that commits a violation of the securities laws may be held jointly and severally liable with the primary violator." *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1304–05 & n.7 (10th Cir. 1998) (citing 15 U.S.C. § 78t(a)). But liability under Section 20(a) can arise only when, first, the plaintiff identifies a primary violation of the securities laws. *See In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1347 (10th Cir.

2012); *see also Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1107 (10th Cir. 2003) ("[W]e have explained that to state a prima facie case of control person liability, the plaintiff must establish (1) a primary violation of the securities laws and (2) control over the primary violator by the alleged control person." (internal quotation marks, citation, and alteration omitted)).

The court already has concluded that the Complaint's generalized and conclusory allegations don't provide the particularity required to satisfy Rule 23.1's demand futility requirement.  For the same reasons, the court can't find particularized allegations to demonstrate a plausible primary violation of the securities laws.  And without successfully crossing that first bridge, plaintiff can't discharge its duty to state a viable claim for control person liability under Section 20(a).  *See In re Zagg Sec. Litig.*, No. 2:12-CV-852, 2014 WL 505152, at *8 (D. Utah Feb. 7, 2014), *aff'd*, 797 F.3d 1194 (10th Cir. 2015) (concluding that because plaintiffs "have not sufficiently alleged a primary violation of either § 10(b) or § 14(a) by any of the Defendants[,]" so their Section 20(a) "claims fail as a matter of law" (citation omitted)).

### 5.   Summarizing the Court's Conclusions About Plaintiff's Federal Claims

In sum, the court grants defendants' Motion to Dismiss (Doc. 15) plaintiff's federal claims.  That's because a thorough review of the Complaint's allegations reveals that it lacks the particularity demanded under Rule 23.1.  It's also because many of the Complaint's allegations mirror what other courts have found deficient under a Rule 23.1 analysis, meaning the court here has influential (if not controlling) case law to guide it.

In lieu of alleging specifics, the Complaint lists a bevy of factual observations—specific amounts of financial loss incurred by MGP during its aged whiskey roll out, details about the surface-level responsibilities for corporate leaders, and specific language from the company's public statements, press releases, and financial filings.  But none of these factual observations

provide the particularized factual allegations that plaintiff must produce to proceed on his federal claims.[9]

Instead, and in place of particularized factual allegations, plaintiff marshals only generalized and conclusory allegations.  Each one of them asks the court to infer more than it reasonably can from the information provided.  The court can't infer bad faith motive based only on the failure of the aged whiskey strategy.  *See Stone*, 911 A.2d at 373 ("With the benefit of hindsight, the plaintiffs' complaint seeks to equate a bad outcome with bad faith.").  Nor can the court deduce a fraudulent motive based simply on plaintiff's observation that MGP's leadership felt confident in a strategy that didn't work.  *See Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1246 (10th Cir. 2016) ("Based on the plaintiffs' allegations . . . we can infer only that the four executives were overly optimistic[.]").  The court can't reach these inferences because the Complaint fails to provide that path.  Rule 23.1 and related case law require that plaintiff allege more than he has, and provide particularized factual allegations about how and why demand would've proved futile.  He hasn't supplied that factual information.  And so, the court must grant defendants' Motion to Dismiss (Doc. 15) against plaintiff's federal claims.

**B.  The Court Denies Defendants' Motion to Dismiss Plaintiff's State Law Claims and Stays this Case Pending the Kansas Supreme Court's Ruling in *Herington*.**

Having dismissed the Complaint's federal claims, the court now turns to plaintiff's state law claims.  These allegations—presented in Counts I, II, and III of the Complaint—constitute the majority of plaintiff's claims against defendants.  These state law claims follow a different jurisdictional path than plaintiff's use of federal question jurisdiction.  According to the

---

[9]     And, as noted already, some of plaintiff's allegations even undermine his fundamental premise.  For instance, MGP's public announcements and SEC filings all contain clear cautionary language, even if couched alongside hopefully optimistic sentiments.  None of them expressed gratuitous promises.

Complaint, plaintiff can assert these state law claims in federal court because they fall under the court's supplemental jurisdiction in 28 U.S.C. § 1367(a).  *See* Doc. 1 at 2 (Compl. ¶ 2).

This statute provides, in relevant part:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a).  Supplemental jurisdiction is an option—not a mandate.  And district courts don't fly blind when they make the decision whether to exercise supplemental jurisdiction. Instead, several factors guide the inquiry.  The Supreme Court directs district courts to consider "the values of judicial economy, convenience, fairness, and comity[.]"  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).  And the Tenth Circuit has amplified this guidance, directing its constituent courts to survey similar considerations.  *See Wittner v. Banner Health*, 720 F.3d 770, 781 (10th Cir. 2013) ("[W]e have said the court should consider retaining state claims when, given the nature and extent of pretrial proceedings, judicial economy, convenience, and fairness would be served by retaining jurisdiction." (citation and internal quotation marks omitted)).

Our Circuit also has expressed a *preference* that district courts, when they dismiss all federal claims, typically should decline to exercise supplemental jurisdiction over state law claims.  *See Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998) ("When all federal claims have been dismissed, the court may, *and usually should*, decline to exercise jurisdiction over any remaining state claims." (emphasis added)).  Still, the ultimate decision is committed to the district court's sound discretion.  *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1138–39 (10th Cir. 2004).

In this Order, the court already has concluded that plaintiff's federal claims fail as a matter of law because: (1) he failed to plead demand futility in the fashion required by the particularity standard in Fed. R. Civ. P. 23.1 and the laws of Kansas, and (2) his Section 20(a) control person liability claim fails for the independent reason that he hasn't alleged sufficiently a primary violation of the federal securities law. Typically, this finding would end the court's inquiry because it would make it more appropriate for a state court to decide plaintiff's remaining state law claims. This inclination is informed by the requirement that the court consider notions of fairness and comity, among others. *See Cohill*, 484 U.S. at 350; *see also Wittner*, 720 F.3d at 781.

But the court can't decline supplemental jurisdiction over those state law claims without first addressing a novel holding by the Kansas Supreme Court. *See Stanfield v. Osborne Indus., Inc.*, 949 P.2d 602 (Kan. 1997); *see also Rhoten v. Dickson*, 223 P.3d 786 (Kan. 2010). Twice, the state's supreme court has ruled that res judicata bars a plaintiff from pursuing refiled state law claims after a federal district court—having dismissed all federal claims—declined to exercise supplemental jurisdiction over those state law claims. *Id.* In both cases, the federal district court had dismissed the state law claims without prejudice. *Id.*

In *Stanfield*, 949 P.2d at 612–13, and in *Rhoten*, 223 P.3d at 797–98, the Kansas Supreme Court ruled that the formerly federal court plaintiff couldn't pursue state law claims in state court merely because they *could* have asserted those claims in federal court—even though the federal court had declined to consider the state law claims at all. Specifically, the state supreme court held, "[c]laim preclusion prohibits a party from asserting in a second lawsuit any matter that might have been asserted in the first lawsuit." *Stanfield*, 949 P.2d at 612 (citing *Prospero Assocs. v. Burroughs Corp.*, 714 F.2d 1022, 1025 (10th Cir. 1983)). Under this rule, a "legal

theory does not even need to be raised in the first action, more or less considered by the court, in order for it to be precluded in a later action under the claim preclusion doctrine[.]" *Id.* at 612–13; *see also Rhoten*, 223 P.3d at 799 ("Based on the *Stanfield* decision's continuing strength, we affirm . . . that claim preclusion barred [plaintiff] Rhoten from renewing her state law claims in state court after they were dismissed *without* prejudice in federal court." (emphasis added)).[10]

One Kansas judge has noted this peculiar wrinkle in Kansas law.  In *Herington v. City of Wichita*, Judge Gordon Atcheson of the Kansas Court of Appeals concurred in the result but wrote separately to express his views about the rule in *Stanfield* and *Rhoten*.  479 P.3d 482, 484 (Kan. Ct. App. 2020) (Atcheson, J., concurring).  In Judge Atcheson's words, the "Kansas Supreme Court fashioned an eccentric and exceedingly unfair rule of res judicata in *Stanfield* . . . and perpetuated that eccentricity and unfairness in *Rhoten*[.]"  *Id.*  Judge Atcheson opined that the *Stanfield* rule "undercuts the purpose of 28 U.S.C. § 1367 . . . and presumably runs afoul of the Supremacy Clause of the United States Constitution as a result."  *Id.*  For these reasons, he urged the Kansas Supreme Court to "consider taking this opportunity to reexamine what was done nearly 25 years ago in *Stanfield* and to realign this state's application of res judicata with conventional preclusion principles."  *Id.*

Judge Atcheson got his wish.  Recently, the Kansas Supreme Court heard oral argument in an appeal presenting precisely this issue.  But at this Order's entry, that case remains undecided.  This uncertainty informs this court's thinking here.  With the possibility of change

---

[10]      According to one legal commentator, the combined force of *Stanfield* and *Rhoten* "is contrary to the purpose of claim preclusion" and "contravenes justice[.]"  Patricia J. Kluin, *Kansas' Rationale Is Dust in the Wind:  Why the Dismissed Supplemental Claim Exception to the General Rule of Claim Preclusion Is Necessary (Rhoten v. Dickson, 223 P.3d 786 (Kan. 2010))*, 50 Washburn L.J. 511, 527–31 (2011).  As this commentator explained, *Stanfield* and *Rhoten*'s rule "effectively limits the discretionary aspect of supplemental jurisdiction" because its logic "essentially compels a federal court to exercise supplemental jurisdiction[.]"  *Id.* at 532–33.

on the horizon, the court is mindful of a separate-but-similar judicial doctrine designed to avoid conflicts between federal court decisions on constitutional law and unsettled matters of state law. *See R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 499–500 (1941) (holding the "last word" about the meaning of a state law at issue "belongs" to the supreme court of the state where the law was enacted); *see also Caldara v. City of Boulder*, 955 F.3d 1175, 1178 (10th Cir. 2020) ("'The *Pullman* concern is that a federal court will be forced to interpret state law without the benefit of state-court consideration and . . . render the federal-court decision advisory and the litigation underlying it meaningless.'" (quoting *Moore v. Sims*, 442 U.S. 415, 428 (1979) (brackets omitted))).

This court prefers to hear from the Kansas Supreme Court on the issue of claim preclusion in Kansas. This approach will avoid the risk of deciding an issue purely of state law in a framing that the state supreme court's review of *Herington* might render "meaningless." *Caldara*, 955 F.3d at 1178. The court explains its decision about plaintiff's state law claims, below.

### 1.  Discussion

The court has two options available to it:

*First*, it can decline to exercise supplemental jurisdiction over plaintiff's state law claims, under 28 U.S.C. § 1367, and thus dismiss them without prejudice. This option has the virtue that it adheres to the general rule endorsed by the Tenth Circuit. *See Smith*, 149 F.3d at 1156 ("When all federal claims have been dismissed, the court may, *and usually should*, decline to exercise jurisdiction over any remaining state claims." (emphasis added)). But this option comes with an unsavory conclusion. It means that plaintiff—should he try to reassert his state law claims in

Kansas state court following a dismissal without prejudice here—likely would face the death knell imposed by the current rule in *Stanfield* and *Rhoten*.

To be more specific, the court assumes defendants in a refiled Kansas state court case would invoke the *Stanfield*/*Rhoten* rule and ask the state court to dismiss the state law claims. While the court can't say for certain how the state court would rule, it seems likeliest—on the current state of Kansas law—that the state court would dismiss the reasserted state law claims with prejudice. But even that prediction comes with a modicum of uncertainty because of the Kansas Supreme Court's recent decision to review *Herington*.

*Second*, and as an alternative, the court could depart from usual practice, exercise supplemental jurisdiction over plaintiff's state law claims, and proceed to adjudicate them. This option has the advantage of giving plaintiff his day in court on the merits—whatever they are— of his state law claims. But it also has its shortcomings. Namely, it will insert federal judicial power into controversies that are now purely issues of state law. And, it will do so on a record that is poorly developed. The parties' papers barely address anything about the state law claims, let alone the nuanced dynamics bound up in plaintiff's state law claims.[11]

Weighing all these interests on one scale doesn't produce the most appealing outcome. So, the court chooses instead a third alternative. It consists of these components:

1. The court denies, for now, defendants' Motion to Dismiss (Doc. 15) against plaintiff's three state law claims.

2. The court stays the case on its own motion, pending the Kansas Supreme Court's decision in its review of *Herington v. City of Wichita*, 479 P.3d 482 (Kan. Ct. App. 2020).

---

[11]     For that matter, plaintiff's Complaint doesn't specify which state's common law he invokes for Counts I, II, and III—alleging, respectively, (I) Breach of Fiduciary Duty, (II) Waste of Corporate Assets, and (III) Unjust Enrichment. This ambiguity manifests another reason why it's unwise for federal courts to supplant the authority, purpose, and expertise that state courts typically bring to state law claims.

3.  The court orders the parties to file one Joint Report within seven days of the Kansas Supreme Court's decision in *Herington*. This Joint Report must attach a copy of the supreme court's decision in *Herington* and inform the court of the next appropriate action for this case in light of the state supreme court's ruling. The court also orders counsel to confer about their view of the *Herington* decision and determine whether they can develop a consensus about the future of plaintiff's state law claims. Even if they can't, the parties still must file *one* Joint Report setting out their competing positions. This Joint Report shall not exceed 5 pages in length.

The court then will review the parties' Joint Report and determine the best path forward. The principles embraced in Fed. R. Civ. P. 1 will guide this determination.

### C.     The Court Dismisses Plaintiff's Federal Claims With Prejudice.

There's one more issue to resolve for now. As laid out in earlier sections of this Order, the court has decided to grant defendants' Motion to Dismiss (Doc. 15) in part and deny it in part. The court grants the motion as it applies to plaintiff's federal claims because all of them fail to satisfy the demand futility analysis under Fed. R. Civ. P. 23.1. This conclusion begs a question: Should plaintiff get a second chance to argue these claims?

Both sides of the dispute argue this point. Plaintiff contends that—should any of his claims fail—he deserves an opportunity to amend his Complaint. *See* Doc. 17 at 2 ("Plaintiff Carter respectfully requests that he be given thirty (30) days to amend his complaint[.]"). Defendants ask the court to reject plaintiff's request. *See* Doc. 18 at 2 ("Nor should Plaintiff's brief be interpreted as a request for leave to file an amended complaint." (citation omitted)).

Defendants have the better end of this argument for two reasons. *First*, plaintiff misstates the governing law for amended pleadings. Plaintiff argues that "he still possesses his one amendment as of right and thus has the opportunity to improve his federal and state claims and distinguish his claims from those asserted to date by plaintiff Dorfman[,]" the other, similar case

40

where the court already has dismissed the federal claims.  Doc. 17 at 2.  But plaintiff is simply wrong about federal civil procedure.

Rule 15 of the Federal Rules of Civil Procedure governs amendments to pleadings.  That Rule provides that a litigant may amend "as a matter of course" and without leave of court "21 days after serving it, or" alternatively "21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier."  Fed. R. Civ. P. 15(a)(1)(A)–(B).  "*In all other cases*, a party may amend its pleading only with the opposing party's written consent or the court's leave."  Fed. R. Civ. P. 15(a)(2) (emphasis added). Defendants filed their Motion to Dismiss (Doc. 15), under Rules 12(b)(6) and 23.1 of the Federal Rules of Civil Procedure, on April 14, 2021.  *See* Doc. 15.  Plaintiff long ago ran out of time to amend his pleading as a matter of course.

That leaves only one other option:  Rule 15(a)(2)'s instruction that amendment is permitted "only with the opposing party's written consent or the court's leave."  Fed. R. Civ. P. 15(a)(2).  Clearly, defendants haven't consented.  And plaintiff hasn't filed a motion asking the court for leave to amend his Complaint.  Instead, that request is found in his responsive brief. *See* Doc. 17 at 2.  Rule 15, it's true, encourages courts to "freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  But defendants highlight controlling precedent from our Circuit that precludes plaintiff from securing leave by using the method plaintiff has invoked here.  *See Vestring v. Halla*, 920 F. Supp. 2d 1189, 1193 (D. Kan. 2013) ("However, a plaintiff's bare request in response to a motion to dismiss 'that leave be given to the Plaintiffs to amend their Complaint' is insufficient." (quoting *Calderon v. Kan. Dep't of Soc. & Rehab. Servs.*, 181 F.3d 1180, 1186 (10th Cir. 1999)); *see also Calderon*, 181 F.3d at 1186–87 ("[W]e conclude that a request for leave to amend must give adequate notice to the district court and to the opposing

party of the basis of the proposed amendment before the court is required to recognize that a motion for leave to amend is before it."). So, the court denies plaintiff's generic request because it fails to satisfy controlling precedent.

## IV.     Conclusion

Plaintiff's Complaint asks the court to infer nefarious motives based only on general observations about MGP's disappointing performance with its aged whiskey strategy. A business strategy gone awry doesn't necessarily entail the existence of a fraudulent scheme. And plaintiff's Complaint comes nowhere near the level of particularity that our court, our Circuit, and other courts nationwide demand when considering a derivative shareholder's pleadings.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Motion to Dismiss (Doc. 15) is granted in part and denied in part. The court grants the motion as it applies to plaintiff's federal claims but denies the motion as it applies to plaintiff's state law claims. The court dismisses plaintiff's federal claims with prejudice.

**IT IS FURTHER ORDERED BY THE COURT THAT** this case is **STAYED**, pending the Kansas Supreme Court's review of *Herington v. City of Wichita*, 479 P.3d 482 (Kan. Ct. App. 2020).

**IT IS FURTHER ORDERED BY THE COURT THAT** the parties shall file one Joint Motion within **seven days** of the Kansas Supreme Court's decision in *Herington*, informing the court of the next appropriate action in light of the state supreme court's ruling, and setting forth counsels' consensus or points of disagreement about the future course of this case following that ruling.

**IT IS SO ORDERED.**

**Dated this 9th day of November, 2021, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**